UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
SEP 2 4 1999
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**DOCKETED**
JAN 1 1 2001

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. CHERRY GRANT, Plaintiff, vs. RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL CENTER, Defendant. | No. 99 C 6313<br><br>FILED UNDER SEAL<br><br>JURY TRIAL DEMANDED<br><br>Judge Aspen |

## COMPLAINT

### INTRODUCTION

Plaintiff, the United States of America, by Cherry Grant, as the relator, ("Relator" or "Grant") brings this action under the False Claims Act, as amended, 31 U.S.C. §§3729, *et seq.*, ("False Claims Act") and under the common law, and alleges as follows:

1. This is an action by Grant on behalf of the United States to recover penalties and damages arising from a fraudulent billing scheme in which the defendant, Rush-Presbyterian-St. Luke's Medical Center ("Defendant") willfully and deliberately overcharged the United States Government for hospital and clinic examinations, as well as other medical services provided to Medicare and Medicaid patients. The Defendant has billed the United States Government for false and improperly coded medical services for at least the period from 1993 through 1998.

2. This complaint is based upon non-public information regarding the Defendant's University Transplant Program which the Relator obtained through Relator's personal observation of the acts and conduct of the Defendant.

1-1

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 31 U.S.C. §§3732(a) and (b) because it is an action brought under 31 U.S.C. §3730.

4. Venue is proper in this district pursuant to 31 U.S.C. §3732(a) because the Defendant is located in this district and transacts business in this district and the Defendant committed a number of acts proscribed by 31 U.S.C. §3729 in this district.

## PARTIES

5. Cherry Grant, Relator in this *qui tam* action, is a resident of the Chicago, Illinois. Since at least January 1, 1993, Ms. Grant has worked as a nurse clinician in the Defendant's University Transplant Program, also known as the Liver and Kidney Transplant Clinic ("Clinic") of Rush-Presbyterian-St. Luke's Medical Center. Ms. Grant has direct, personal knowledge of non-public information relating to Defendant's fraudulent billing practices.

6. The Defendant is a full service hospital, medical center and health care provider located in Chicago, Illinois, and is also a teaching institution.

## FACTUAL BACKGROUND

7. The Medicare and Medicaid Programs are large medical assistance programs involving billions of dollars in Government spending to health care providers each year. As alleged below, Defendant submitted or caused to be submitted false or improper claims for treatment of Medicare beneficiaries and Medicaid recipients under the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§1395, *et seq.*, and the Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§1396. *et seq.* in violation of the False Claims Act. The False Claims Act

imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval to the federal Government. 31 U.S.C. §3729(a)(1).

8. Medicare is a federal health insurance program that serves people who are 65 years of age or older, as well as certain disabled people. Medicaid is a federally funded health insurance program that provides medical care for the indigent. In Illinois, Medicaid is administered by the Illinois Department of Public Aid.

9. As one of its functions, the United States Department of Health and Human Services ("HHS"), through the Health Care Financing Administration ("HCFA"), administers the Medicare Program.

10. HHS administers the Medicare Program in the State of Illinois through a private insurance contractor, or "carrier," as authorized by 42 U.S.C. §1395u. Under this administration, the carrier reviews claims for reimbursement submitted by a Medicare provider and, after verifying that the patient has Medicare coverage, makes payment on those claims according to the Medicare reimbursement schedule. These payments involve 100% federal funds.

11. Medicare reimburses hospitals such as the Defendant in two ways. First, Medicare Part A funds hospitals that care for Medicare patients. Second, Medicare Part B pays physicians who provide "identifiable personal" care for Medicare patients.

12. The Defendant receives many millions of dollars from Medicare and Medicaid by providing health care services to patients who are eligible for reimbursement from these programs. These Medicare and Medicaid funds account for a substantial percentage of the Defendant's total revenue.

13. The Defendant's University Transplant Program consists of pre-transplant evaluation and diagnosis and post-transplant care and follow-up for patients needing kidney, liver, pancreas and small bowel transplants. The largest part of its work is with liver and kidney transplants. The majority of the patients in the University Transplant Program during the relevant time period were Medicare or Medicaid recipients.

## CHARGES FOR SERVICES NOT ACTUALLY PROVIDED BY THE CLINIC'S ATTENDING PHYSICIANS

14. In 1969, the Bureau of Health Insurance (now known as the HCFA) issued Intermediary Letter 372 ("IL 372") which reaffirmed an earlier policy that attending physicians could bill for services provided by residents to the attending physician's patients but only so long as the residents acted under the attending physician's *direct, personal* and *identifiable* supervision and control and as long as the attending physician submitted sufficient documentation to evidence the level of care rendered by the attending physician. This letter was published in the Federal Register in 1969, and, since that date, the Defendant has had notice of HCFA's "physical presence" requirement for the billing of services. In 1995, the HCFA clarified IL 372's physical presence requirement. In a Final Rule dated December 8, 1995, the HCFA stated that the attending physician must be present during the "key portion" of the service or procedure provided by the resident to the Medicare recipient.

15. A physician can only be reimbursed for an examination if he or she: (a) is physically present during the "key portion" of services performed; (b) adequately describes the services performed; and (c) signs the patient's medical chart. For example, if the physician is not physically

4

present during the "key portion" of the procedure, then even if the services performed are adequately described, the exam is not properly reimbursable by Medicare and/or Medicaid.

16. For at least the past several years, in violation of law, the Defendant and its physicians have billed Medicare and/or Medicaid for services allegedly rendered by surgeons or attending physicians in connection with examination of patients at the Clinic, even though the surgeon or attending physician was not present for and/or did not participate in the "key portion" of the examination. In many cases, the proper attending physician was not even in the Clinic and a nurse conducted the examination. In other cases, services were provided by volunteer physicians from Defendant's hepatology clinic but the services were billed as if they had been provided by the Clinic's surgeons or attending physicians. In so doing, the Defendant has collected substantial revenues from the federal Government without actually providing or properly documenting the services claimed.

17. As part of their duties and responsibilities, physicians at the University Transplant Program or Clinic, are supposed to see patients in the Clinic on a rotating basis on one day per week. In recent years, the Clinic has been held on Tuesdays. The Clinic opens at 8:30 a.m. on Tuesdays. However, in some instances, the designated attending physician was not at the Clinic on Tuesdays. In other cases, the attending physician arrived late and many patients left before the attending physician ever arrived and, thus, patients were not actually administered medical care by the attending physician. The Government was nonetheless billed for patient visits as if the services had been provided by one of the Clinic's physician. The Defendant's "rule" or practice was that as long as one of the attending physicians was "in" the Clinic during Clinic hours on the same day as a patient, the Government would be billed for a physician visit, even if the patient and attending

physician were not in the Clinic at the same time, and even if the physician did not examine or treat the patient.

18. The fraudulent billing practices described herein were furthered by the Defendant's use of an expansive definition of "in" the Clinic. The Clinic consists of numerous rooms, offices and workspaces. As long as the attending physician was within the Clinic's physical confines at some time on the day in question during Clinic hours, he was deemed by Defendant to have been in the Clinic for billing purposes, whether he actually saw a patient or not.

19. Starting in 1993, it was common for patients at the Clinic to see no doctors at all for extended periods of time during their post-transplant care. One or more patients complained of this.

20. The Defendant also encouraged and permitted Clinic physicians to bill for examinations of their patients when the examinations were actually performed by non-Clinic physicians. This so-called "cross coverage" is also fraudulent; it condones billings by absent attending physicians.

21. At regular Clinic staff meetings, the Clinic's attending physicians' lack of attention to their patients was noted and discussed, and all were reminded that the Clinic's attending physicians and surgeons must see patients because the Government was being billed by the Clinic for the visits. During one such meeting, it was remarked that Drs. Suman Kaur and Scott Cotler, who were not attending physicians in the Clinic, but physicians from the Hepatology Clinic who volunteered in the Clinic, were "running the [transplant] Clinic."

22. Certain nurse visits with patients (and sometimes their families), referred to on the Clinic's bills as "beeper talk," resulted in bills for physician services being generated and submitted to the Government.

23. This practice of billing Medicare and/or Medicaid for services, whether or not performed by one of the Clinic's attending physician, (or, in some cases, any physician at all) was pervasive and ingrained.

24. The Defendant's administration is and was aware of these fraudulent practices, but only addressed them after it learned of an investigation into similar practices at the University of Pennsylvania by the federal Government. For example, during Clinic staff meetings and discussions of billing, Dr. James W. Williams, the former director of the Clinic, and other physicians, would joke about not wanting to go to federal prison for Medicare fraud because "orange (the perceived color of prison inmate jumpsuits) is not your [or our] color." At Clinic staff meetings, Dr. Williams would often remark on the absence of proper attending physicians or surgeons. For example, he stated on one occasion in mid or early 1998 that he had walked through the Clinic and not seen any of the Clinic's attending physician or surgeon present.

25. On one or more occasions, the Clinic's doctors stated that it did not matter which physician actually saw a patient, as long as some physician had seen the patient, and that it was "splitting hairs" to distinguish between which physicians had seen which patients for billing purposes.

26. Defendant and Defendant's physicians knew that if they disclosed to the Government or the HCFA that patient exams were conducted without the presence of proper attending physicians, their claims for reimbursement for the attending physicians would be denied. Therefore, the Defendant willfully concealed from the Government, and conspired to conceal from the Government, the fact that the Clinic's physicians were billing for services they did not actually render, and/or did not properly document.

27. At one or more points in time, Drs. Kaur and Cotler expressed concerns over the method by which the Clinic was billing the Government. For example, Drs. Kaur and Cotler would discuss patient bills and ask how the Clinic could bill for patients not seen by an attending physician and remark that it was fraud to do so.

28. The person responsible for actually doing the Clinic's billing, Teena Jops, was advised on more than one occasion that she was not properly billing the Government for services, and she responded in words or substance that her method of billing for the Clinic's physician visits was the way the Clinic had always billed and would continue to bill. On information and belief, Ms. Jops' compensation was tied to the amount of money collected by the Clinic.

29. Since the problems that are the subject of this case came to the fore, there has been a marked upswing in the number of patients actually seen in the Clinic by its attending physicians, and it is now policy that attending physicians actually see patients, though the visits are often exceedingly brief.

### BILLING FOR SERVICES IN EXCESS OF THOSE ACTUALLY PERFORMED

30. The American Medical Association ("AMA"), in conjunction with HCFA, has established numeric codes (known as Current Procedural Terminology Codes, or "CPT Codes") to identify a wide variety of medical procedures and services offered by medial care providers. These CPT Codes, and the criteria for the corresponding medical procedures and services, are published annually by the AMA, and are used by most medical care providers throughout the United States in billing physician and outpatient services, including the Defendant.

8

31. CPT Codes are used for physician evaluation and management services at the Clinic. The appropriate CPT Code should be determined according to detailed criteria documented in the patient's medical record, which reflect the severity of the patient's medical condition and the complexity of the services rendered.

32. Each of these billing codes have criteria that include, *inter alia*, the amount of time spent by a physician, as well as the level and detail of service provided. The longer and more involved the services provided, the "higher" the CPT Code and the greater the reimbursement from Medicare or Medicaid.

33. Medicaid is a federally-funded program established to pay for medical care for the indigent. In Illinois, Medicaid is administered by the Illinois Department of Public Aid ("IDPA"). Under the Medicaid program, IDPA established reimbursement levels corresponding to each of the CPT Codes. Health care providers submit claims for treatment of Medicaid recipients to IDPA. IDPA then pays the claim according to Medicaid's reimbursement schedule.

34. Under the Medicare program, the HCFA has established reimbursement levels corresponding to each of the CPT Codes. Health care providers submit claims for treatment given to Medicare patients, showing the appropriate Code or Codes.

35. From approximately 1993 until the start of the use of the superbill, in approximately 1997, billing was performed simply by looking at the daily "attendance list" of patients who visited the Clinic. A bill for physician services was automatically generated for each patient who had been in the Clinic on that day, without regard to which physician, if any, actually saw the patient(s).

36. The Clinic's employees, *i.e.*, nurses, were required to fill in a "billing sheet" in connection with each patient's visit. They were instructed to check the name of the attending

9

physician who was responsible for the patient on the billing sheet, even if the attending physician did not actually see the patient.

37. During the relevant time period, and specifically with reference to the period from 1997 to 1999, Defendant used what was referred to as a "SUPER. BIL" or "superbill" to code patient visits according to what services were provided. The Defendant's "superbill," however, only listed the three highest codes, and completely omitted the two lowest codes. Thus, all patient visits were of necessity coded on one of the three highest codes. In practice, almost all patient visits were coded "99214", the second highest code, without regard to what services were performed.

38. Defendant billed Medicare and/or Medicaid using the CPT Code for "moderate" examinations regardless of the services actually provided. Following transplant surgery, patients would return to the Clinic for follow-up treatment(s). Nurses and other personnel of Defendant were instructed to and did code all such visits as "Code 99214-Follow-Up/Moderate Complexity/<30 minutes," the second highest of five codes, without regard to the nature of the treatment provided, or whether the attending physician actually saw the patient.

39. In 1998, after the concerns about Defendant's billing practices came to light, Defendant began to use a new form of superbill which had five - rather than just the three highest - CPT Codes.

### INPATIENT CARE

40. With respect to inpatient care, Defendant maintained a running chart listing the inpatients and what services were provided to them. It noted such items as "lines" (intravenous lines) and biopsies. Initially, all inpatients were billed under Dr. Williams, the former director of

the Clinic. Later, the practice changed to list the patient billing under whatever doctor was in the Clinic when the patient was admitted.

41. The Government was improperly billed for all biopsies and lines as services provided by physicians, even though it was fellows, or persons on fellowships, who actually performed the procedures. On information and belief, the attending physicians did not perform transplant biopsies or insert intravenous lines.

*   *   *

42. After the billing problems described herein came to light internally, Dr. Williams was relieved of his duties.

43. Between 1997 and 1999, the Clinic's attending physicians did not usually sign Relator's patient notes on the superbill. After the billing problems that are the subject of this case came to the fore, one of the Clinic's physicians, Dr. McChesney went back and withdrew Relator's notes and signed them, sometimes with annotations. On information and belief, Dr. McChesney usually had seen the patients in question. It had previously been recommended by management that surgeons sign or cosign Relator's patient notes.

44. Sometime after the billing practices at the Clinic became known to Defendant, the Defendant temporarily changed its billing practices to delete all billing for physician visits at the Clinic. This was soon abandoned as being too much of a "red flag" to auditors or others who might review or question the Clinic's billing practices. Now, the rule or practice is that one of the Clinic's physician must actually see a patient in order for the Government to be billed.

45. Medicare and/or Medicaid paid all or substantially all of the false and/or improperly coded claims submitted by the Defendant.

## COUNT I

## FALSE CLAIMS ACT

46. Relator repeats and realleges each allegation above as if fully set forth herein.

47. This is a *qui tam* civil action brought by the Relator and the United States Government to recover treble damages and civil penalties under 31 U.S.C. §3729(a)(1) of the False Claims Act, which provides, in relevant part, that it is unlawful for any person to knowingly present or cause to be presented, "to an officer or employer of the United States Government . . . a false or fraudulent claim for payment" or to knowingly make use or cause to be made or used "a false record or statement to get a false or fraudulent claim paid or approved by the Government."

48. The Defendant has violated 31 U.S.C. §3729(a) in that for at least six years - from 1993 through 1998 - it repeatedly, willfully and intentionally:

   (a) submitted false and/or fraudulent claims for payment to an officer or employee of the United States Government; and

   (b) made, used or caused to be made or used, a false record or statement to get a false or fraudulent claim paid by the United States Government.

49. In reliance on these false claims, the United States Government, by and through the IDPA and the local Medicare Intermediaries, overpaid the Defendant.

50. As a result of the Defendant's violations of, *inter alia*, 31 U.S.C. §3729(a), the United States Government has been damaged in an amount in excess of one million dollars ($1,000,000), exclusive of interest.

51. Relator is a private person with direct an independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 31 U.S.C. §3730(b) on behalf of herself and the United States Government.

## RELIEF

52. Relator respectfully requests this Court to award the following damages to the following parties, and against the Defendant as follows:

To the United States Government:

1. three times the amount of actual damages which the United States Government has sustained as a result of Defendant's fraudulent practices;

2. a civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant submitted to the United States Government;

3. prejudgment interest; and

4. all costs of this action.

To the Relator:

a) 30% of all the proceeds of this action, pursuant to 31 U.S.C. §3730(d);

b) reimbursement of the expenses which Relator incurred in connection with this action;

c) an award of reasonable attorneys' fees;

d) the costs and disbursements of this action; and

e) such other relief as this Court deems just.

## COUNT II

### UNJUST ENRICHMENT

53. Relator repeats and realleges each allegation above as if fully set forth herein.

54. This is a civil action brought by the Relator and the United States Government to recover from the Defendant the amount by which it has been unjustly enriched.

13

55. The Defendant was not entitled to the Medicare and Medicaid payments obtained through the improper billings referred to above, and it has been unjustly enriched to the extent of such payments.

56. By reason of the foregoing, the United States Government has been damaged in the amount of or is entitled to recover several million dollars.

### **RELIEF**

Relator and the United States, demand and pray that a judgment be entered in their favor and against the Defendant in an amount equal to the Medicare and/or Medicaid payments unjustly obtained by Defendant, plus interest, costs, and such other relief as may be appropriate and just.

Dated: September 24, 1999

Respectfully submitted,

Government of the United States,
ex rel. Cherry Grant

By: _____
Attorney for Cherry Grant

Arthur T. Susman
Charles R. Watkins
Robert J. Emanuel
Susman & Watkins
Two First National Plaza
Suite 600
Chicago, Illinois 606063
(312) 346-3466

JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I (a) PLAINTIFFS

UNITED STATES OF AMERICA, ex rel.
CHERRY GRANT

## DEFENDANTS

RUSH-PRESBYTERIAN-ST. LUKE'S
MEDICAL CENTER

**DOCKETED**
**JAN 11 2001**

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __COOK__
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT __COOK__
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

SUSMAN & WATKINS
TWO FIRST NATIONAL PLAZA, SUITE 600
CHICAGO, ILLINOIS 60603
(312) 346-3466

ATTORNEYS (IF KNOWN)

**FILED**
SEP 24 1999
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

[X] 1 U.S. Government Plaintiff
[ ] 2 U.S. Government Defendant
[ ] 3 Federal Question (U.S. Government Not a Party)
[ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business in This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business in Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Claims under 31 U.S.C. §§3729, et. seq. for improperly billing the United States Government for medical services provided to Medicare and Medicaid recipients.

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | PERSONAL INJURY / PERSONAL INJURY | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 362 Personal Injury—Med Malpractice | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability / [ ] 365 Personal Injury—Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 | | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 630 Liquor Laws | PROPERTY RIGHTS | [ ] 450 Commerce/ICC Rates/etc. |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability / [ ] 368 Asbestos Personal Injury Product Liability | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 650 Airline Regs | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 345 Marine Product Liability / PERSONAL PROPERTY | [ ] 660 Occupational Safety/Health | [ ] 840 Trademark | [ ] 810 Selective Service |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle / [ ] 370 Other Fraud | [ ] 690 Other | | [ ] 850 Securities/Commodities/Exchange |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability / [ ] 371 Truth in Lending | LABOR | SOCIAL SECURITY | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury / [ ] 380 Other Personal Property Damage | [ ] 710 Fair Labor Standards Act | [ ] 861 HIA (1395ff) | [ ] 891 Agricultural Acts |
| [ ] 195 Contract Product Liability | [ ] 385 Property Damage Product Liability | [ ] 720 Labor/Mgmt. Relations | [ ] 862 Black Lung (923) | [ ] 892 Economic Stabilization Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | [ ] 863 DIWC/DIWW (405(g)) | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 441 Voting | | [ ] 864 SSID Title XVI | [ ] 894 Energy Allocation Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | Habeas Corpus | | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 530 General | [ ] 730 Labor/Mgmt. Reporting & Disclosure Act | |
| [ ] 245 Tort Product Liability | [ ] 440 Other Civil Rights | [ ] 535 Death Penalty | [ ] 740 Railway Labor Act | |
| [ ] 290 All Other Real Property | | [ ] 540 Mandamus & Other | FEDERAL TAX SUITS | [ ] 950 Constitutionality of State Statutes |
| | | [ ] 550 Civil Rights | [ ] 790 Other Labor Litigation / [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [X] 890 Other Statutory Actions |
| | | | [ ] 791 Empl. Ret. Inc. Security Act / [ ] 871 IRS—Third Party 26 USC 7609 | |

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

[X] 1 Original Proceeding
[ ] 2 Removed from State Court
[ ] 3 Remanded from Appellate Court
[ ] 4 Reinstated or Reopened
[ ] 5 Transferred from another district (specify)
[ ] 6 Multidistrict Litigation
[ ] 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
[ ] UNDER F.R.C.P. 23

DEMAND $ 

Check YES only if demanded in complaint:
JURY DEMAND: [X] YES [ ] NO

## VIII. REMARKS
In response to [ ] is not a refiling of a previously dismissed action
General Rule 2.21D(2) this case [ ] is a refiling of case number _____ of Judge _____

DATE: September 24, 1999

SIGNATURE OF ATTORNEY OF RECORD

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

UNITED STATES OF AMERICA, ex rel.
CHERRY GRANT,
      vs.
RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL CENTER.

Case Number:

DOCKETED JAN 1 1 2001
FILED SEP 2 4 1999
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiff, United States of America, ex rel. Cherry Grant

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME: Arthur T. Susman | NAME: Charles R. Watkins |
| FIRM: Susman & Watkins | FIRM: Susman & Watkins |
| STREET ADDRESS: Two First National Plaza | STREET ADDRESS: Two First National Plaza |
| CITY/STATE/ZIP: Chicago, Illinois 60603 | CITY/STATE/ZIP: Chicago, Illinois 60603 |
| TELEPHONE NUMBER: (312) 346-3466 | TELEPHONE NUMBER: (312) 346-3466 |
| IDENTIFICATION NUMBER: 02778602 | IDENTIFICATION NUMBER: 03122790 |
| MEMBER OF TRIAL BAR? YES ☒ NO ☐ | MEMBER OF TRIAL BAR? YES ☒ NO ☐ |
| TRIAL ATTORNEY? YES ☒ NO ☐ | TRIAL ATTORNEY? YES ☒ NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME: Robert J. Emanuel | NAME: |
| FIRM: Susman & Watkins | FIRM: |
| STREET ADDRESS: Two First National Plaza | STREET ADDRESS: |
| CITY/STATE/ZIP: Chicago, Illinois 60603 | CITY/STATE/ZIP: |
| TELEPHONE NUMBER: (312) 346-3466 | TELEPHONE NUMBER: |
| IDENTIFICATION NUMBER: 06229212 | IDENTIFICATION NUMBER: |
| MEMBER OF TRIAL BAR? YES ☐ NO ☒ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☒ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |

PLEASE COMPLETE IN ACCORDANCE WITH INSTRUCTIONS ON REVERSE.